UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ROBIN LATORRE, PATRICIA ANDERSON, and ARKENDIA WILLIAMS individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br>v.<br><br>GENERAL MOTORS LLC, a Delaware limited liability company,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

Plaintiffs Robin LaTorre ("Ms. LaTorre"), Patricia Anderson ("Ms. Anderson"), and Arkendia Williams ("Ms. Williams"), and (collectively, "Plaintiffs") bring this action individually and on behalf of all persons in the United States who purchased or leased a 2010 through and including 2015 Cadillac SRX designed, manufactured, marketed, distributed, sold, warranted, and serviced by Defendant General Motors LLC, ("GM") (hereinafter, the "Class Vehicles") (owners and lessees of Class Vehicles hereinafter, the "Class Members"). Plaintiffs allege the following:

1.      This case arises out of a design defect that poses a significant safety hazard for thousands of consumers.

1

2.     Upon information and belief, over 300,000 Class Vehicles have been sold or leased in the United States.

3.     Upon information and belief, the seals GM uses in the Class Vehicles headlights' exterior housing units wear out prematurely, thereby allowing moisture to accumulate and condense.  The moisture causes the headlights to malfunction and/or fail because it corrodes the lamp assembly components and/or because it causes electrical shorts (hereinafter, the "Headlight Defect").

4.     As a result of the Headlight Defect, the Class Vehicles present a safety hazard and constitute a danger to consumers. The Headlight Defect can result in very dim light output or no light at all.  Such malfunctions will necessarily result in low visibility at best, which can contribute to injurious, or even fatal, traffic accidents. Indeed, purchasers of the Class Vehicles have complained to the National Highway Traffic Safety Administration ("NHTSA") of accidents or near accidents as a result of the Headline Defect. Hundreds more have complained to the NHTSA and in online forums of the challenges of driving with dim light output and their fears of an accident.

5.     By way of just one example, an owner of a 2012 SRX complained to the NHTSA just days ago that the Headlight Defect caused an accident that resulted in the vehicle becoming airborne:

> I had an accident due to the low beam lights on my 2012 Cadillac SRX. It was still dark at 5:30AM when I failed to

> see the outer road turned which caused me to collide with
> a curb and become airborne. This accident caused 3 blown
> out tires and 2 ruined rims. This cost me $1700 and it was
> all caused by the extremely dim low beam headlights.

6. An owner of a 2014 SRX described fears of driving at night due to

the Headlight Defect:

> I am scared to death to drive my car at night. The low beam
> lights are horrible. I ask the dealer if there was a recall and
> they always say no. It is bad to avoid driving at night and
> missing out on things with family and friends. I have
> cancer and it sure would be nice to enjoy driving with the
> time I have left. Shame on you Cadillac.[1]

7. Recent complaints in October and December 2018 further underscore

a wide range of concerns associated with the Headlight Defect, including

accidents, the cost of replacement, and risk of traffic tickets:

> While driving our car at night we encounter poor visibility
> to almost no visibility. Bright beams work but we can't
> drive legally with bright beams on. This has occurred
> always at night, on the highway, on city streets and
> traveling through the mountains. On a dark night, the light
> cast is so poor that the lane lines are not visible. I have
> had several near hits due to this problem and I wonder if
> other vehicles aren't seeing our car. This headlight system
> is dangerous and could be deadly. The most recent
> episode was while driving through the mountains from
> [T]ennessee to [O]hio.[2]

---

[1] Poor Headlight Visibility, Carcomplaints.com,
https://www.carcomplaints.com/Cadillac/SRX/2014/lights/poor_headlight_visibilit
y.shtml/ (last visited April 10, 2019). (Exhibit 1)
[2] Headlights Problems of Cadillac SRX – part 1, carproblemszoo.com,
http://www.carproblemzoo.com/cadillac/srx/headlights-problems.php (last visited
April 10, 2019). (Exhibit 2)

\*\*\*

> I've only had this car for 6 months, why is there condensation inside the lens. I refuse to have to continue to pay to have light replaced for this issue. I cant replace the bulb myself seeing that the whole damn bumper has to be taken off. This is not ok so this needs to be fixed asap. People don't have $$$ laying around every time a bulb burns out because of water/condensation inside to take it to someone that gonna charge you 2 or 3 hundred dollars a pop.[3]

\*\*\*

> I can't drive my car at night because the headlight lens are so fogged up it does not let the light come through to see what is front of me. I've been pulled over twice and cops told me they thought I was driving at night with just my driving lights on and warned me to get fixed.  The deal told me its common with this car and said it will cost me $2300.00 to get it fixed.[4]

8.    GM was aware of the Headlight Defect and the associated safety concerns.  In fact, it issued several Technical Service Bulletins ("TSBs") to dealers regarding the problem.  However, GM did not notify the putative class members, warn future purchasers of the defect or change its vehicle advertising to reflect the defect.

_____

[3] Water in Lights, Carcomplaints.com,
https://www.carcomplaints.com/Cadillac/SRX/2010/lights/water_in_lights.shtml_
(last visited April 10, 2019).  (Exhibit 3)
[4] *Id*.

9. The protocol in the TSBs is inadequate to resolve the Headlight Defect.

10. To make matters worse, rather than redesigning the defective components and installing non-defective ones, GM purports to "repair" the Class Vehicles but instead it simply replaces the complained-of components with the very same defectively designed parts and components.

11. Thus, Class Vehicle owners incur costs in the amount of thousands of dollars for diagnosing, repairing, or replacing the headlights and their component parts. Indeed, the NHTSA is replete with complaints that the costs are well above $1,500, and sometimes as high as $5,000.

12. These costs are out-of-pocket because GM refuses to extend the warranty to cover them. In doing so, GM unfairly shifts the costs to the Class Members and benefits from the revenue generated by repeat repairs when consumers are required to pay multiple hundreds of dollars to repair or replace the headlights and related components as a result of the Headlight Defect, while GM is unjustly enriched at their expense.

13. On information and belief, all Class Vehicles are equipped with the same or substantially identical headlight assemblies, and the Headlight Defect is the same for all Class Vehicles.

14. Beginning as early as 2010, through consumer complaints and dealership repair orders, among a myriad of other internal sources and means, GM

knew or should have known that the Headlight Defect in the Class Vehicles present a safety hazard.

15.     On information and belief, GM's corporate officers, directors, or managers knew about the Headlight Defect and failed to disclose it to Plaintiffs and purchasers at the time of sale, lease, repair, and all times thereafter.

16.     In fact, as a result of the consumer complaints that it was receiving, GM issued a Customer Satisfaction Campaign ("CSC") that covered, *inter alia*, the 2010 Cadillac SRX and identified a condition caused by the loss of electrical contact between the halogen headlamp connectors and low beam head lamp bulbs that "could cause the headlamp and/or daytime running lamp to work intermittently." CSC No. 10043330-5822. The CSC offered to reimburse customers who had paid for this repair, however, as noted earlier, GM simply replaced the headlamps with the same defectively designed parts.

17.     After the CSC, GM did not remedy the Headlight Defect; and in fact, never notified the public or its consumers, including the Class Members, that it was selling the Class Vehicles with a defective Headlight which was the same or substantially similar to the type that had been the subject of the CSC.

18.     Just weeks ago, GM also sent out a notice to some putative class members providing them with reimbursement for prior out-of-pocket headlight replacement costs and the cost of diagnosis of headlights "for moisture-related

6

issues." GM also offers to replace the headlamps "if you believe it is necessary."

19.     GM's latest effort is inadequate for several reasons.

20.     First, GM's notice did not sufficiently reach Class Members. Only some Class Members received such a notice—indeed, none of the Plaintiffs received it, though their vehicles suffer from the Headlight Defect.

21.     Second, GM, once again, has neither remedied the Headlight Defect nor issued a comprehensive recall of all Class Vehicles. Instead, it offers just reimbursement for prior repair costs or a diagnosis and replacement of the headlamp. But GM will only provide  reimbursement up to $1,600, hundreds less than what many Class Members have had to pay to replace their headlamps. GM also does not pay for any diagnosis and replacement up front. Rather, it places the onus on the individual first to seek and pay out of pocket for a diagnosis and replacement if he or she "believe[s] it is necessary" and GM would issue a reimbursement. Notably, GM requires a person to do any diagnosis and replacement within 90 days of the date of the letter, even though problems associated with the Headlight Defect may surface only after that time period. Moreover, GM, as noted above, simply replaces the headlamps with the same defectively designed parts.

22.     Because GM has failed to notify Class Members of the Headlight Defect and has taken wholly inadequate steps to address the issue, Plaintiffs and Class Members continue to use vehicles with a defect that creates dangerous and

unexpected driving hazards and causes accidents.

23. The Headlight Defect is inherent and was present in all of the Class Vehicles at the time of sale.

24. GM knew about the Headlight Defect, along with its accompanying dangerous safety effects, and GM concealed its knowledge from Plaintiffs and Class Members at the time of sale, lease, repair, and all times thereafter. In fact, instead of repairing the defects in the defective headlights, GM either refused to acknowledge the existence of the Headlight Defect or performed replacement "repairs" that simply concealed its design defects.

25. If Plaintiffs had known about the Headlight Defect at the time of sale or lease, Plaintiffs and Class Members would have paid less for the Class Vehicles or may not have purchased or leased them.

26. As a result of their reliance on GM's omissions, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles, including expenses for headlight-related repairs. As a result of the Headlight Defect, Plaintiffs and Class Members were harmed and suffered actual damages.

## **THE PARTIES**

27. Plaintiff Robin LaTorre is a citizen of the state of New York who

resides in Kingston, New York.

28.     Plaintiff Patricia Anderson is a citizen of the state of Maryland who resides in Upper Marlboro, Maryland.

29.     Plaintiff Arkendia Williams is an Ohio citizen who resides in Maple Heights, Ohio.

30.     Defendant General Motors LLC is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan. The sole member and owner of General Motors LLC is General Motors Holdings LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan. General Motors Holdings LLC's only member is General Motors Company, a Delaware corporation with its principal place of business in the State of Michigan. General Motors Company has 100% ownership interest in General Motors Holdings LLC.

31.     General Motors LLC ("GM"), through its various entities, designs, manufactures, markets, distributes, services, repairs, sells, and leases passenger vehicles, including the Class Vehicles, nationwide. General Motors LLC is the warrantor and distributor of the Class Vehicles in the United States.

32.     At all relevant times, GM was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components throughout the United States.

## JURISDICTION AND VENUE

33.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed Classes is a citizen of a different state than Defendant GM.

34.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332(d) as Plaintiffs and other members of the proposed Classes are citizens of states different from GM's state of citizenship.

35.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

36.     Since 2010, GM has designed, manufactured, distributed, sold, and leased the Class Vehicles equipped with the Headlight Defect nationwide directly or indirectly through dealers and other retail outlets to thousands of Class Members.

37.     Upon information and belief, the seals in the Class Vehicles' headlight assemblies wear out or deteriorate unexpectedly and prematurely, allowing moisture to accumulate and damage the assemblies' internal components. Upon further

information and belief, it is alleged that the vents that allow air flow to maintain pressure and prevent the lenses from cracking increase the tendency for water to accumulate and condense in the housing units. These defects result in damage to assembly components, such as corroding igniters and burnt-out bulbs.

38.     The Class Vehicles are unreasonably dangerous to consumers because the Headlight Defect prevents their safe operation. For example, as the Headlight Defect progresses, the excessive accumulation of water or condensation can damage crucial components—like the igniter and the bulb—resulting in diminished light output or catastrophic failure. Malfunctioning or inoperative headlights impair drivers' ability to operate the vehicles safely, because they decrease drivers' visibility and make the Class Vehicles themselves more difficult for other drivers or pedestrians to see. Class Members have also resorted to using their high beams as their main source of light when driving at night, blinding drivers in front of them or in the opposite direction. In short, the dim light output resulting from the Headlight Defect raises the risk of accidents, particularly after dusk, before dawn, or in inclement weather.

39.     Indeed, Class Members have already experienced accidents or near accidents as a result of the Headlight Defect.

40.     The alleged Headlight Defect is inherent in all Class Vehicles and the Headlight Defect is the same for all Class Vehicles.

41. The Headlight Defect diminishes the intrinsic and resale value of Class Vehicles.

42. Since at least 2010, GM has been aware of the defective nature of the headlights but has failed to disclose it to consumers. As a result of GM's unfair, misleading, deceptive, and/or fraudulent business practices, in failing to disclose the Headlight Defect to Plaintiffs and putative class members, Plaintiffs and the Class Members have suffered injury in fact, incurred damages, and have otherwise been harmed by Defendants' conduct.

43. Specifically, Plaintiffs and Class Members have experienced accidents, have had to change their driving habits, including avoiding driving at night or in inclement weather, and have had to expend substantial money and time attempting to repair the Headlight Defect. Moreover, had Plaintiffs and the putative class members known of the Headlight Defect, they would not have purchased or leased those vehicles, or would have paid substantially less for them. Moreover, because of the Headlight Defect, the class members' vehicles have a lower market value, and are inherently worth less than they would be.

## The Headlight Defect Poses a Significant Safety Hazard

44. The Headlight Defect impairs or prevents Plaintiffs and Class Members from driving the Class Vehicles safely. These hazards include *very* dim light output that diminishes visibility or catastrophic failures that effectively preclude visibility.

Driving with poor visibility due to such conditions presents danger to Plaintiffs and putative Class Members, other drivers, and pedestrians by significantly increasing the risk of collisions. No consumer expects to purchase or lease a vehicle that may be non-operational at before dawn, after dusk, or in inclement weather. The safety risk imposed by the Headlight Defect is objectively unreasonable.

45.    Upon information and belief, thousands of purchasers and lessees of Class Vehicles have experienced problems with the headlights. Complaints filed by consumers with NHTSA and elsewhere online demonstrate that the defect is widespread, dangerous, and manifests without warning.

46.    Upon information and belief, GM, like other car manufacturers, regularly monitors the NHTSA database for consumer complaints. As such, these complaints also indicate GM's awareness of the Headlight Defect and of the attendant hazards it creates for consumers and the general public.

### Plaintiffs' Experiences

### Robin LaTorre

47.    In or about October 2017, Ms. LaTorre purchased a Certified Pre-Owned 2015 Cadillac SRX from Ingersoll Cadillac of Pawling which is located in Pawling, New York.

48.    Prior to purchase, Ms. LaTorre saw television commercials, magazine advertisements, and magazine reviews, on the vehicle and also test

drove it.

49.     In making her purchase, Ms. LaTorre relied on GM's representations in its commercials and other advertisements that Class Vehicles would be free from defects and safe to operate.

50.     At the time she purchased her 2011 Cadillac SRX, the vehicle's odometer read approximately 53,000 miles.

51.     In November 2017, Ms. LaTorre noticed that the driver's side headlight had failed.  Since the failure occurred within a month of purchase, Ingersoll Cadillac of Pawling replaced the headlight as a one-time courtesy.

52.     In or about January 2018, Ms. LaTorre noticed that the passenger light looked very dim and was failing to illuminate the road at night.

53.     Ms. LaTorre's Cadillac SRX vehicle has and continues to exhibit the Headlight Defect described herein and she has and will suffer a loss as a result of the Headlight Defect.

54.     Ms. LaTorre's Cadillac SRX headlights continue to malfunction, and she fears they can fail completely at any time without warning.

55.     Ms. LaTorre purchased her vehicle primarily for personal, family, or household use.

56.     GM did not disclose the Headlight Defect before Ms. LaTorre purchased her Class Vehicle.  Had GM disclosed the Headlight Defect, she would

14

not have purchased her Class Vehicle or she would have paid less for it.  GM's omissions were material to her decision to purchase her Class Vehicle.

57.    At all times, Ms. LaTorre, like all Class Members, has driven her vehicle in a foreseeable manner and in the manner in which it was intended to be used.

### Patricia Anderson

58.    In or about July 2015, Ms. Anderson purchased a new 2015 Cadillac SRX from Waldorf Cadillac which is located in Waldorf, Maryland.

59.    Prior to purchase, Ms. Anderson saw television commercials, magazine advertisements, magazine reviews on the vehicle,and test drove it.

60.    In making her purchase, Ms. Anderson relied on GM's representations in its commercials and other advertisements that Class Vehicles would be free from defects and safe to operate.

61.    Beginning in or about May 2019, Ms. Anderson noticed that the headlights were failing to illuminate the road at night.

62.    On May 29, 2018, Ms. Anderson brought her car to Waldorf Cadillac who informed her that (1) she would have to pay of pocket for replacement parts in the amount of $1,500, and even if she did, (2) the replacement parts would also eventually fail. Because of the steep cost and the fact the parts would eventually fail again, Ms. Anderson did not replace the headlights.

63.     Ms. Anderson's Cadillac SRX vehicle has and continues to exhibit the Headlight Defect described herein and she has and will suffer a loss as a result of the Headlight Defect.

64.     Ms. Anderson's Cadillac SRX headlights continue to malfunction, and she fears they can fail completely at any time without warning.

65.     Ms. Anderson purchased her vehicle primarily for personal, family, or household use.

66.      GM did not disclose the Headlight Defect before Ms. Anderson purchased her Class Vehicle.  Had GM disclosed the Headlight Defect, she would not have purchased her Class Vehicle or she would have paid less for it.  GM's omissions were material to her decision to purchase her Class Vehicle. At all times, Ms. Anderson, like all Class Members, has driven her vehicle in a foreseeable manner and in the manner in which it was intended to be used.

**Arkendia Williams**

67.     In or about September 2017, Ms. Williams purchased a 2011 Cadillac SRX from Toyota of Bedford, which is located in the city of Bedford, Ohio.

68.     Prior to purchasing her 2011 Cadillac SRX, Ms. Williams saw television commercials, magazine advertisements, magazine reviews, on the vehicle and test drove it.

69.     In making her purchase, Ms. Williams relied on GM's representations in its commercials and other advertisements that Class Vehicles would be free from defects and safe to operate.

70.     At the time she purchased her 2011 Cadillac SRX, the vehicle's odometer read approximately 80,000.

71.     Shortly after Ms. Williams purchased her vehicle in September 2017, the driver's side headlight went dim and thereafter stopped working. She noticed condensation in the headlights and on the lenses.  Ms. Williams took her car to Crestmont Cadillac who replaced the left side assembly at a cost of $1,398.60, which she paid out of pocket.

72.     In December of 2018, the driver's side headlight stopped working. Here, again, Ms. Williams noticed condensation on the failed bulb and on the lenses.

73.     Ms. Williams's Cadillac SRX vehicle has and continues to exhibit the Headlight Defect described herein and she has suffered a loss as a result of the Headlight Defect.

74.     Ms. Williams's Cadillac SRX headlights continue to malfunction, and she fears they can fail completely at any time without warning.

75.     Ms. Williams purchased her vehicle primarily for personal, family, or household use.

76.   GM did not disclose the Headlight Defect before Ms. Williams purchased her Class Vehicle.  Had GM disclosed the Headlight Defect, she would not have purchased her Class Vehicle or she would have paid less for it.  GM's omissions were material to her decision to purchase her Class Vehicle.

77.   At all times, Ms. Williams, like all Class Members, has driven her vehicle in a foreseeable manner and in the manner in which it was intended to be used.

### The Headlight Defect Infects All Class Vehicles

78.   As referenced herein, the Headlight Defect impacts nearly all owners and lessees of the 2010-2015 Cadillac SRX series.  The following are selections of safety complaints, among the multiple hundreds filed with NHTSA, describing, *inter alia*, the  danger of driving with dim light output, the out-of-pocket costs that Class Members have to pay, and the fact that GM is aware of the Headlight Defect (*all caps; spelling, and grammar in original*).  *See* https://www.nhtsa.gov/vehicle (accessed on January 14, 2019).

**2010 Cadillac SRX**

a.   <u>November 6, 2014</u>: PASSENGER HEADLIGHT (SEALED BEAM) FAILED TO TURN ON 2 DAYS AGO. I ASSUMED IT WAS A BULB BUT THE DEALER IDENTIFIED IT AS A SHORT DUE TO WATER AND CONDENSATION ACCUMULATION INSIDE THE HOUSING. THE LIGHT DID COME BACK ON FOR A SHORT TIME WHILE DRIVING TO THE DEALERSHIP, BUT WAS OFF AGAIN UPON ARRIVAL. DEALER STATED THE OTHER LIGHT

WOULD BE AFFECTED SOON AS WELL, BASED ON WATER INSIDE IT TOO. I HAVE THE HIGHEST LEVEL EXTENDED WARRANTY PLAN (GM MAJOR GUARD), BUT THE SEALED BEAM HEADLIGHTS ARE EXCLUDED FROM THIS PLAN. DEALER QUOTED COST OF $1,800 PER LIGHT, TOTAL OF $3,600 TO REPAIR. THIS IS A DESIGN FLAW, BASED ON NUMEROUS CADILLAC COMPLAINTS AS WELL AS NOTES FOUND ON NHTSA. IN ITS CURRENT STATE, THE VEHICLE IS NOT DRIVABLE IN LOW VISIBILITY CONDITIONS OR AT NIGHT BECAUSE THE HEADLIGHTS HAVE FAILED DUE TO A DESIGN FLAW. DEALER WILL NOT REPAIR UNDER WARRANTY, AND WITHOUT REPAIR THE VEHICLE WILL NOT EVEN PASS A STATE SAFETY INSPECTION. THIS IS A RECALL WORTHY FAULT WHICH COULD LEAD TO LOSS OF LIFE IF FAULT OCCURS IN LOW VISIBILITY OR NIGHT DRIVING, AND RENDERS THE VEHICLE UNSAFE AS IT WILL NOT PASS STATE SAFETY INSPECTION. PLEASE FORCE GM TO ISSUE RECALL ON THIS ISSUE. I AM CURRENTLY TRYING TO FIGURE OUT HOW TO PAY ALMOST $4,000 ON MY $56K VEHICLE TO GET IT DRIVABLE AGAIN, WHEN IT'S UNDER THE PREMIERE WARRANTY PLAN. THIS POLICY IS UNSATISFACTORY AT BEST. *TR

b.  December 1, 2014: I OWN A 2010 CADILLAC SRX. THE PASSENGER HEADLAMP HAS ACCUMULATED SOME CONDENSATION. AS I WAS READING ONLINE THIS IS A KNOWN FLAW OF DESIGN FOR THIS MODEL (EVEN 2013 MODELS) THAT GM IS AWARE OF. AS THE HOLIDAY APPROACHED WE TRAVELED OUT OF TOWN. AS WERE LEAVING I WAS TOLD BY A FAMILY MEMBER THAT MIGHT PASSENGER HEADLAMP WAS INOPERABLE. SO MY GUESS WAS THAT IT WAS EITHER A SAFETY MECHANISM THAT THE CAR WILL SHUT THE LIGHT OUT TO PREVENT A SHORT OR WORST A FIRE. WELL IT WAS COMPLETE OPPOSITE. THIS MORNING MY LOCAL CADILLAC DEALERSHIP HAS CONCLUDED THE KNOWN FLAW IN THE

HEADLAMP ACTUALLY SHORTED OUT MY BULD. NOW I HAVE RECEIVED A QUOTE FOR OVER $1000++ TO REPLACE A FLAW IN THEIR DESIGN. HOW IS THIS GOOD BUSINESS? IF IT IS A KNOWN ISSUE TAKE CARE OF IT RIGHT? THIS IS A DESIGN FLAW BASED ON NUMEROUS CADILLAC COMPLAINTS AS WELL AS NOTES FOUND ON THIS VERY NHTSA WEBSITE. IN IT'S CURRENT STATE, THE VEHICLE IS NOT DRIVABLE IN LOW VISIBILITY CONDITIONS OR AT NIGHT BECAUSE THE HEADLIGHTS HAVE FAILED DUE TO A DESIGN FLAW. DEALER WILL NOT REPAIR UNDER EXTENDED WARRANTY AND WITHOUT REPAIR THE VEHICLE WILL NOT EVEN PASS A STATE SAFETY INSPECTION. THIS IS A RECALL WORTHY FAULT WHICH COULD LEAD TO LOSS OF LIFE IF FAULT OCCURS IN LOW VISIBILITY OR NIGHT DRIVING, AND RENDERS THE VEHICLE UNSAFE AS IT WILL NOT PASS STATE SAFETY INSPECTION. PLEASE FORCE GM TO ISSUE RECALL ON THIS ISSUE. *JS

c.   February 7, 2018: PASSENGER HEADLIGHT ASSEMBLY IS FULL OF WATER, POSSIBLY DUE TO A FAULTY SEAL. THIS IS A KNOWN ISSUE AMONG OWNERS, AND WILL EVENTUALLY CAUSE THE HEADLIGHT TO SHORT OUT AND BECOME INOPERABLE. REPLACEMENT IS OVER $1500, AND CADILLAC REPLACES ASSEMBLIES WITH THE SAME FAULTY SEAL.

d.   December 30, 2018: THE LIGHTS ARE EXTREMELY DIM. VERY DANGEROUS ON THE ROAD. I'VE REPLACED THE FUSES FOR THE HEADLIGHTS. I'VE REPLACED THE ENTIRE HEADLIGHT ASSEMBLY AND STILL NO LUCK. ONE DONE RESEARCH ONLINE AND THERE ARE NUMEROUS PEOPLE COMPLAINING ABOUT THIS ISSUE. CADILLAC WILL NOT FIX IT.

e.   July 31, 2018: VISIBILITY AT NIGHT IS SO POOR THAT I DON'T FEEL COMFORTABLE DRIVING THIS VEHICLE AFTER DARK. IT IS LIKE THE LIGHTS ARE

WORKING ABOUT 30%. I LOOKED ONLINE AND NOTICED THERE IS A PATTERN WITH THIS MAKE AND MODEL AND THE POOR VISIBILITY/LIGHTING AT NIGHT. THIS IS A HORRIBLE SAFETY ISSUE AND A RECALL NEEDS TO BE ISSUED. CONSUMERS EXPECT CADILLAC TO BE ABOVE THE STANDARD AND WE PAY MORE FOR THAT. WE SHOULD NOT HAVE THESE KINDS OF ISSUES AND BE EXPECTED TO PAY OUT OF POCKET TO REPAIR THEM. A RECALL SHOULD BE ISSUED TO MAKE THESE VEHICLES SAFE TO DRIVE AT NIGHT.

**2011 Cadillac SRX**

f.  October 24, 2013: THE LOW BEAM HEADLIGHTS ARE VERY DIM. THEY DO NOT REACH OUT LIKE THEY SHOULD. DEALER TELLS ME THAT'S THE WAY THEY ARE, I DO NOT FEEL THEY ARE SAFE!!! *TR

g.  October 13, 2015:  TL* THE CONTACT OWNS A 2011 CADILLAC SRX. WHILE DRIVING AT VARIOUS SPEEDS, THE LOW BEAM HEAD LAMPS FAILED TO FULLY ILLUMINATE AND DIMINISHED THE CONTACT'S VISIBILITY. THE CONTACT HAD TO ACTIVATE THE HIGH BEAMS IN ORDER TO INCREASE VISIBILITY. THE VEHICLE WAS TAKEN TO A DEALER WHO WAS UNABLE TO DIAGNOSE OR REPAIR THE VEHICLE. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 30,000.

h.  February 15, 2016:  LOW BEAMS ARE TOO DIM. WHEN I'M ON ROADS THAT DO NOT HAVE REFLECTIVE STRIPES I CAN'T SEE THE SIDES OF THE ROAD. THIS IS PARTICULARLY DANGEROUS WHEN APPROACHING ONCOMING TRAFFIC.

i.  December 13, 2017: EXTREME MOISTURE BUILDUP IN BOTH HEADLIGHT ASSEMBLIES CAUSING DECREASED NIGHTTIME VISIBILITY AND ADDITIONALLY CAUSING BULBS TO BLOW OUT.

PURCHASED 2011 SRX USED IN 2017 WITH 63,000 MILES, NOT AWARE OF THE DEFECT AT THAT TIME. A LIMITED WARRANTY WAS ALSO PURCHASED FOR AN ADDITIONAL $2700 BUT WAS INFORMED AFTER ASKING THE DEALERSHIP TO INVESTIGATE THAT DEFECTIVE HEADLIGHTS ARE NOT COVERED. QUOTED ALMOST $5,000 TO REPLACE BOTH. THIS IS HIGHLY UNSAFE AS WELL AS UNFAIR TO THE PUBLIC, NOT ONLY THE RISK OF FAILURE POTENTIALLY CAUSING BODILY HARM BUT I DO NOT BELIEVE THAT I SHOULD BE REQUIRED TO PAY AN ADDITIONAL $5,000, NOT INCLUDING THE WARRANTY PURCHASED, TO REPAIR A MANUFACTURER'S DEFECT.

j.  November 27, 2018: BOTH HEADLIGHTS ARE DIM EVEN AFTER PUTTING NEW HEADLIGHT BULBS IN. ONE HEADLIGHT HAS ALSO ACCUMULATED MOISTURE FROM THE WEATHER WHICH HAS CAUSED A YELLOW TINT WHICH ALSO DIMS THE LIGHTING. I HAVE TO USE MY HIGH BEAMS TO SEE TURNS WHICH IS DANGEROUS FOR ME AND OTHER DRIVERS. THE FACT THAT I PUT NEW BULBS IN AND STILL CAN'T SEE WHEN I'M DRIVING IS A HUGE PROBLEM AND I FEAR AN ACCIDENT COULD HAPPEN BECAUSE OF THIS FAULT.

k.  December 25, 2018:  HEADLIGHTS VERY LOW. CAN'T SEE ROAD AT NIGHT. ON COMING VECHICLES HONK THEIR HORN AT YOU CAUSE THEY THINK YOUR LIGHTS ARE OFF. HAVE TO DRIVE ON HIGH BEAMS. KEEP HAVING TO REPLACE BULBS.

**2012 Cadillac SRX**

l.  December 26, 2016: LOW BEAM HEADLAMPS ARE DISFUNCTIONAL. THEY ARE SO DIM, YOU CANNOT DRIVE THE VEHICLE AT NIGHT WITHOUT THE AIDE OF THE HIGH BEAM HEADLAMPS.

m. <u>April 29, 2017</u>: MOISTURE BUILDUP IN FRONT HEADLIGHTS CAUSED BULBS TO SHORT OUT AND NOW NOT WORKING ON LOW BEAM. THIS IS A MAJOR SAFETY ISSUE AND FROM WHAT I HAVE SEEN HAPPEN QUITE OFTEN ON THIS PART OF THE CADILLAC SRX. WENT TO DEALERSHIP TO HAVE IT REPLACED AND SINCE OUT OF WARRANTY IT WAS GOING TO BE ~ $2K. RIDICULOUS!

n. <u>January 1, 2019</u>: I PURCHASED MY 2012 IN 2016. RECENTLY MY HEADLIGHTS HAVE STARTED TO DIM. IT BECOMES VERY HARD TO SEE AT NIGHT TO THE POINT THAT IT ALMOST LOOKS AS IF I DON'T HAVE ANY LIGHTS ON IT ALL. MOST OF THE TIME I HAVE TO CUT MY HIGH BEAMS ON WHICH CREATES A PROBLEM FOR ONCOMING TRAFFIC.

**2013 Cadillac SRX**

o. <u>July 19, 2017</u>: THE HEADLIGHTS ON THIS VEHICLE ARE DANGEROUSLY DIM. I HAVE SPOKEN TO NUMEROUS OWNERS WHO SUGGESTED THE SAME ISSUE. THE DEALERSHIPS WANT TO CHARGE OVER $2000.00 TO CORRECT THIS AND IT IS NOT CLEAR THAT REPLACING THESE LIGHTS WITH THE SAME LIGHTS WILL REPAIR THE ISSUE. THIS NEEDS GOVERNMENT ACTION OR PEOPLE WILL GET HURT.

p. <u>March 6, 2018</u>: HEADLIGHTS ARE SO DIM THAT I HAVE TO DRIVE WITH BRIGHTS ON CONTINUOUSLY AT NIGHT. WHEN ONCOMING TRAFFIC SIGNALS ME BY BLINDING ME, I SWITCH TO DIMS AND HAVE TO GUESS AT WHERE THE ROAD IS. THIS IS UNACCEPTABLE. THE VEHICLE WAS BROUGHT IN WHILE STILL UNDER BASIC WARRANTY. PROBLEM NOT RESOLVED. I EVEN PURCHASED AN EXTENDED WARRANTY. NO HELP THERE EITHER. I AM PAYING FOR A VEHICLE THAT I CANNOT SAFELY DRIVE AT NIGHT. NO WAY I CAN LET MY KIDS USE THIS

VEHICLE AT NIGHT. I AM DEEPLY DISAPPOINTED.

q. <u>January 2, 2019</u>:  THE LOW BEAM HEADLIGHTS ARE EXTREMELY DIM. WHILE DRIVING AT NIGHT I HAVE TO USE THE HIGH BEAMS, ALTHOUGH CAUTIOUSLY, SO AS NOT TO BLIND ONCOMING DRIVERS. IF THERE IS A CAR BEHIND ME, I CANNOT SEE THE ROAD IN FRONT OF MY CAR AT ALL; IN FACT, I SEE THE SHADOW OF MY CAR IN FRONT OF ME. THIS IS EXTREMELY UNSAFE AND HAS NOT BEEN RECALLED BY CADILLAC. TO REPLACE THE HEADLIGHTS IS ABOUT $1500 AND IS NOT GUARANTEED TO IMPROVE THE DIM LIGHT SITUATION. I HAVE TO DRIVE AT NIGHT AND IT'S FRIGHTENING. WHY IS NOTHING BEING DONE ABOUT THIS? THERE ARE THOUSANDS OF COMPLAINTS LOGGED ON THE INTERNET. IS THE GOVERNMENT GOING TO INTERVENE ON OUR BEHALF? WHAT RECOURSE DO WE HAVE? AT THIS POINT, I DON'T BELIEVE IT SHOULD BE UP TO INDIVIDUAL OWNERS TO PURSUE RESTITUTION. PLEASE STEP IN AND DO SOMETHING! I BOUGHT THIS CAR FROM A CADILLAC DEALER IN APRIL OF 2017.

## 2014   Cadillac SRX

r. <u>June 2, 2014</u>: TL* THE CONTACT OWNS A 2014 CADILLAC SRX. THE CONTACT STATED THAT WHILE DRIVING AT NIGHT WITH THE LOW BEAM HEADLIGHTS ACTIVATED THE LIGHTS WERE VERY DIM MAKING AND CAUSING THE CONTACT DIFFICULTY IN SEEING PAST 50 FEET IN FRONT OF THE VEHICLE. THE VEHICLE WAS TAKEN TO THE DEALER HOWEVER, THE FAILURE COULD NOT BE DIAGNOSED. THE MANUFACTURER WAS NOT NOTIFIED OF THE ISSUE. THE VIN WAS NOT AVAILABLE. THE FAILURE MILEAGE WAS 200.

s. <u>February 22, 2017</u>: LOW BEAM HEADLIGHTS ARE SO DIM THAT THEY ARE AN ACCIDENT IN WAITING. THEY DO NOT PROJECT FAR ENOUGH TO AVOID "OVER

DRIVING" THEM. DEALER SAYS THEY ARE ADJUSTED TO SPEC. PEDESTRIANS ARE AT RISK AS IS THE RISK OF HITTING WILDLIFE. IN AMBIENT LIGHT CANNOT TELL THE LIGHTS ARE EVEN ON! HAVE INSTALL. D BRIGHTER BULBS TO NO AVAIL. THIS PROBLEM IS INHERENT IN THE CADILLAC AND NEEDS TO BE ADDRESSED AT THE NHTSA. PROBLEM NOTED ALL OVER THE WEB.

t.  August 27, 2018:  DIM HEADLIGHTS ARE VERY LOW. VERY UNSAFE TO DRIVE AT NIGHT WITH DIM LIGHTS ON. WE HAVE NOTICED THAT THE BLINKER IS BRIGHTER THAN THE ACTUAL LIGHTS. VERY LOW VISABILITY. WHEN DRIVING I OFTEN THINK THE LIGHTS ARE NOT ON WHEN THEY ARE ON LOW BEAM. WOULD NOT BE ABLE TO SEE A CHILD OR ANIMAL (OR ANY OBJECT) IN PATH OF VEHICLE WHEN DRIVING AT NIGHT. OUR SRX IS BLACK SO I'M ALSO CONCERNED ABOUT OTHER VEHICLES SEEING US AT NIGHT W/SUCH POOR LIGHTING. TOTAL DEFECT IN DESIGN. MY HUSBAND WILL DRIVE IT AT NIGHT, BUT I REFUSE TO.

u.  December 2, 2018:  JULY 4, 2018 I WAS INVOLVED IN A REAR END COLLISION WHERE I RAN INTO THE BACK OF A VEHICLE AROUND 9:45PM. IT BOTHERED ME THAT I DID NOT SEE THE CAR UNTIL I WAS RIGHT ON HER. ALL OF A SUDDEN I SAW HER CAR AND SHE WAS MOVING NOT STANDING STILL. IT DAWNED ON ME THAT I COULD NOT SEE HER CAR OR JUDGE THE DISTANCE FROM HER BECAUSE MY HEADLIGHTS ARE NOT BRIGHT ENOUGH TO SEE WHAT IS IN FRONT OF ME. I CAUSED MY INSURANCE RATES TO GO UP. I HAVE NOT BEEN IN A VEHICLE ACCIDENT SINCE THE LATE 1970S. I AM A GOOD DRIVER AND WAS NOT DISTRACTED IN ANY WAY. OVER $3,000 WORTH DAMAGE WAS DONE TO MY CAR AND I'M NOT SURE HOW MUCH TO THE VEHICLE I HIT. CADILLAC NEEDS TO DO SOMETHING ABOUT THE HEADLIGHTS BEFORE THERE IS A SERIOUS ACCIDENT. I HAVE TO DRIVE

WITH MY HIGH BEAMS. I WAS DRIVING ON A TWO WAY BRIDGE AND BOTH CARS WERE IN MOTION.

### 2015   Cadillac SRX

v.   November 8, 2017: WE ARE DRIVING BLIND !!!! PURCHASED OUR 2015 CADILLAC SRX AWD IN NOVEMBER 2017 AFTER RESEARCHING ON BOTH CONSUMER REPORTS AND EDMUNDS... DID OUR TEST DRIVE IN DAYLIGHT... NOW THAT WE'RE OWNERS WE REALIZE THE CAR CANNOT BE DRIVEN AT NIGHT. THE LOW BEAM HEADLAMPS ARE SO DIM ITS WORSE THAN DRIVING WITH PARKING LIGHTS ONLY. WE ARE NOW SHOCKED TO SEE THAT THERE ARE MANY SERIOUS COMPLAINTS ABOUT THIS VERY PROBLEM ALL OVER THE WEB EVERYWHERE EXCEPT FOR THE TWO ABOVE MENTIONED REVIEWERS .IT'S LITERALLY LIKE DRIVING IN THE DARK. WE HAVE TO COORDINATE WHO HAS THE CAR WHEN JUST TO GET HOME SAFELY. PLEASE DO NOT IGNORE THIS!!! THIS IS A SERIOUS FLAW IN GM MANUFACTURING... CANT BELIEVE IT HAD NOT BEEN ADDRESSED. OPERATING THIS VEHICLE AFTER DARK RISKS INJURY OR DEATH. DEALERSHIP TURNING BLIND EYE. THEY WERE HAPPY TO GET RID OF IT? WE WILL NOT LET THIS GO AND INTEND TO DO ALL WE CAN TO EXPOSE, AND DEMAND THIS PROBLEM IS RECTIFIED ASAP.

w.   January 22, 2018:  TL* THE CONTACT OWNS A 2015 CADILLAC SRX. WHILE DRIVING VARIOUS SPEEDS, BOTH LOW BEAM HEADLIGHTS FAILED TO WORK WITHOUT WARNING. THE VEHICLE WAS TAKEN TO THE DEALER (CROSBY CADILLAC, GMC, NISSAN, INC, 2715 MEMORIAL DR, WAYCROSS, GA 31503) WHERE IT WAS DIAGNOSED THAT BOTH LOW BEAM LIGHTS NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOT CONTACTED. THE APPROXIMATE FAILURE MILEAGE WAS 55,000.December 31, 2018:  TL* THE CONTACT OWNS A 2015 CADILLAC

SRX. THE CONTACT STATED THAT THE DIMMER FAILED TO FUNCTION PROPERLY AND THE DAYTIME RUNNING LAMPS DID NOT ILLUMINATE BRIGHTLY ENOUGH. THE CONTACT HAD TO APPLY THE HIGH BEAM HEADLIGHTS IN ORDER TO SEE THE ROAD. ANDREWS CADILLAC (1 CADILLAC DR, BRENTWOOD, TN 37027, (615) 200-9076) WAS CONTACTED AND WERE AWARE OF THE FAILURE, BUT STATED THERE WAS NO REMEDY. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS NOT AVAILABLE.

x. December 28, 2018: DIM HEADLIGHTS ARE DEFECTIVE. I CAN BARELY SEE TO DRIVE AT NIGHT. THERE ARE GROUPS ON FACEBOOK OF NUMBERS OF PEOPLE WITH THE SAME COMPLAINT. PLEASE INVESTIGATE THIS MATTER BEFORE SOMEONE IS KILLED.

**GM Had Superior, Exclusive, and Actual Knowledge of the Headlight Defect**

79. GM had superior and exclusive knowledge of the Headlight Defect and knew or should have known that the defect was not known or reasonably discoverable by Plaintiffs and Class Members before they purchased or leased the Class Vehicles.

80. Plaintiffs are informed and believe and based thereon allege that before Plaintiffs purchased their Class Vehicles, and since at least 2010, GM knew about the Headlight Defect through sources in its exclusive custody and control and thus not available to consumers, including pre-production design failure mode and analysis data, production design failure mode and analysis data, pre-release testing data, early consumer complaints about the Headlight Defect to GM and its agents,

testing conducted in response to those complaints, high failure rates and replacement part sales data, and other aggregate data from Cadillac dealers.

81.    Further, upon information and belief, GM, like other car manufacturers, regularly monitors the NHTSA database for consumer complaints. The NHTSA database is replete with complaints of the Headlight Defect, including complaints of accidents and near accidents, indicating GM's awareness of the Headlight Defect and of the attendant hazards it creates for consumers and the general public.

82.    Further demonstrating GM's knowledge is GM's Customer Satisfaction Campaign ("CSC"), issued in December of 2011, that covered, the 2010 Cadillac SRX and identified a condition caused by the loss of electrical contact between the halogen headlamp connectors and low beam headlamp bulbs that "could cause the headlamp and/or daytime running lamp to work intermittently." CSC No. 10043330-5822 offered to replace the headlamp connectors and low beam bulbs free of charge or to reimburse customers who previously had paid for this repair but did not fix the root cause of the malfunction or exclude the accumulation of moisture and/or condensation in the housing.

83.    In addition, GM has released several iterations of TSBs regarding an inoperative low beam headlamp since May 2010 to address the same issue to its dealers. In May 2010, GM issued the initial TSB, Bulletin No. 10-08-42-001, which applied to various vehicles, including the 2010 Cadillac SRX. The bulletin alerted

service technicians that "[s]ome customers may comment that the low beam headlamp is inoperative." The recommended procedure included replacing the bulb and verifying any discoloration or damage to the connector that would require the replacement of that part too. The TSB was re-issued on or around January 24, 2011, as Bulletin No. 10-08-42-001A, to add vehicles, including the SRX model year 2011, and update the relevant part number. GM subsequently updated the bulletin at regular intervals, releasing Bulletin No. 10-08-42-001C in February 2012, Bulletin No. 10-08-42-001D in November 2014, and Bulletin No. 10- 08-42-001E in May 2015, which bulletin included the SRX model years 2010-2013. The updated TSB explained the repair procedure in far greater detail, which included replacing the wiring harness and inspecting the connector for discoloration at the bulb interface.

84.    At the time that GM issued the TSBs to its dealers it did not issue a notice to its consumers or the Class Members.

85.    GM did not identify the cause of the malfunction to its dealers or customers or the likelihood of recurrence because it was not actually correcting the defect, but merely replacing the Headlights with the same type of defective Headlights. Like the CSC, the TSBs do not identify the root cause of the malfunction or exclude the accumulation of moisture and/or condensation in the housing.

86.    And just weeks ago, GM issued a notice to some putative class members, providing reimbursement for prior out-of-pocket headlight replacement

costs "for moisture-related issues." GM also offered to reimburse for the cost of diagnosis of headlights for the same "for moisture-related issues" and replacement of the headlamps "if you believe it is necessary."

87.   GM's latest effort is once again inadequate.

88.   First, rather than remedy the Headlight Defect as part of a comprehensive recall of all Class Vehicles, GM offers just reimbursement for prior costs. But GM will only reimburse up to $1,600—hundreds less than what many Class Members have had to pay to replace their headlamps.

89.   Second, though GM offers reimbursement for a future diagnosis and replacement, GM puts the burden on the consumer to seek such a diagnosis and a replacement of a headlamp if he or she "believe[s] it is necessary." And the consumer must first pay out of pocket for any diagnosis and replacement—and do so within 90 days of the notice, otherwise GM will not provide a reimbursement. This approach is far from a comprehensive recall. Moreover, any replacement is inadequate because GM simply replaces the headlamps with the same defectively designed parts.

90.   Finally, GM's notice does not have the same reach as a class action notice. Only some Class Members, and none of the Plaintiffs, received such a notice.

91.   The existence of the Headlight Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease

a vehicle. Had Plaintiffs and other Class Members known that the Class Vehicles were equipped with defective headlights, they would not have purchased or leased the Class Vehicles or would have paid less for them.

92.    Consumers, like Plaintiffs, reasonably expect that a vehicle's headlights are safe, will function in a manner that will not pose a safety hazard, and are free from defects. Plaintiffs and Class Members further reasonably expect that GM will not sell or lease vehicles with known safety defects, such as the Headlight Defect, and will disclose any such defects to consumers when it learns of them. Plaintiffs and Class Members did not expect GM to fail to disclose the Headlight Defect to them and to continually deny the defect.

**GM Concealed the Headlight Defect From the Public**

93.    While GM has been fully aware of the Headlight Defect in the Class Vehicles since 2010, it actively concealed the existence and nature of the defect from Plaintiffs and Class Members at the time of purchase, lease, or repair and thereafter. Specifically, GM failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

- any and all known material defects or material nonconformity of the Class Vehicles, including the defects relating to the headlights;

- that the Class Vehicles, including their headlights, were not in good working order, were defective, and were not fit for their intended purposes;  and

31

- that the Class Vehicles and their headlights were defective, despite the fact that GM learned of such defects through failure rates and customer complaints, as well as through other internal sources, as early as 2010.

94.    In fact, GM has always emphasized the quality and reliability of the Class Vehicles and knows that consumers, including Plaintiffs and putative Class Members, rely upon such factors when purchasing or leasing Class Vehicles.

95.    For example, the Cadillac brochure, "The 2011 SRX Crossover" Introducing the All-New 2010 SRX Crossover," assures consumers that "[e]very detail of the SRX Crossover has been carefully considered."[5] The brochure for the 2011 SRX extols its virtues and assures consumers specifically that "passenger safety is a primary consideration throughout the engineering process…[and] the SRX was designed to help avoid collisions."[6] The 2012 SRX brochure states categorically that the vehicle's "Adaptive Forward Lighting…provide[s] optimal illumination closer or farther down the road."[7] And the "2015 SRX" brochure asserts that the "available HD headlamps with Adaptive Forward Lighting help

---

[5] Cadillac, "The All-New 2010 SRX Crossover," *available at* http://www.motorologist.com/wp- content/uploads/2010-Cadillac-SRXbrochure.pdf (last visited April 11, 2019). (Exhibit 4)

[6] Cadillac, "The2011SRX Crossover" *available     at* https://web.archive.org/web/20120126015758/http://www.cadillac.com/content/dam/Cadillac/Global/master/nscwebsite/en/home/Help_Center/Download_Brochure/01_images/Cadillac_2011_SRX.pdf (last visited April 10, 2019). (Exhibit 5)

[7] Cadillac,    "The  2012  Cadillac SRX," *available at* http://www.motorologist.com/wp- content/uploads/2012-cadillac_srx_brochure.pdf (last visited April 10, 2019).  (Exhibit 6)

guide you around curves and corners at night."[8]

96.    Plaintiffs and other Class Members relied on the misrepresentations and/or omissions of GM with respect to the safety and reliability of the Class Vehicles in making their purchases.

97.    Rather than repairing or replacing the defective headlights with headlights without the Headlight Defect, GM issued a series of technical service bulletins advising its technicians to make repairs with the same defective parts. Furthermore, when consumers present the Class Vehicles to an authorized GM dealer for repair of the headlights, GM dealers either inform consumers that their vehicle headlights are functioning properly, or charge customers for repairs that merely mask the defect.

98.    GM failed to disclose the defect to owners and lessees of the Class Vehicles, including Plaintiffs and members of the Class, despite the fact that GM knew or should have known of the defect and its associated safety hazards.

99.    To date, the Headlight Defect remains unresolved.

100.    On information and belief, GM has caused Plaintiffs and Class Members to expend money at its dealerships to diagnose, repair, or replace the Class Vehicles' headlights and their component parts, despite GM's knowledge of

---

[8] Cadillac,"2015 SRX," *available at*
http://www.motorologist.com/wpcontent/uploads/2015_Cadillac-SRX-brochure.pdf (last visited April 11, 2019).  (Exhibit 7)

the Headlight Defect.

101.   Moreover, had Plaintiffs and the putative class members known of the Headlight Defect, they would not have purchased or leased those vehicles, or would have paid substantially less for them. Further, because of the Headlight Defect, the class members' vehicles have a lower market value, and are inherently worth less than they would be. For this reason, Plaintiffs and the other Class Members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

## TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL

102.   Any applicable statute of limitations has been tolled by GM's knowing and active concealment of the dangerous Headlight Defect and the omissions alleged herein. Through no fault or lack of diligence of their own, Plaintiffs and Class Members were deceived regarding the defective headlights and could not reasonably discover the defect and/or the root cause of the defect, or GM's deception with respect to it. When Plaintiffs' and Class Members' headlights intermittently malfunction or fail entirely due to the defect, GM dealers either inform consumers that their vehicle headlights are functioning properly, or charge customers for repairs that merely mask the defect.

103.   Plaintiffs and Class Members did not discover and did not know of any facts that would have caused a reasonable person to suspect that GM was

concealing a defect and/or that the Class Vehicles were equipped with defective headlights or any corresponding safety hazard. As alleged herein, the existence of the Headlight Defect and the safety hazards it creates were material to Plaintiffs and the Class at all relevant times. Furthermore, Plaintiffs and Class Members could not have discovered through the exercise of reasonable diligence that GM was concealing the Headlight Defect during any applicable statutes of limitations.

104.   At all times, GM is and was under a continuous duty to disclose to Plaintiffs and the Classes the true standard, quality, and grade of the Class Vehicles and to disclose the Headlight Defect and associated safety hazards.

105.   GM knowingly, actively, and affirmatively concealed the facts alleged herein, including the unreasonable safety hazards resulting from the alleged defects. Plaintiffs and Class Members reasonably relied on GM's knowing, active, and affirmative concealment.

106.   For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and GM's fraudulent concealment, and GM is estopped from relying on any statutes of limitations in defense of this action.

## **CLASS ACTION ALLEGATIONS**

107.   Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of themselves and members of  the following proposed subclasses (collectively, the "Classes"). Ms. LaTorre brings this action on

behalf of herself and the members of a proposed New York Subclass comprised of
and defined as:

> **All New York residents who purchased or leased any
> 2010-2015 Cadillac SRX vehicle (the "New York
> Subclass").**

108.    Ms. Williams brings this action on behalf of herself and the members
of a proposed Ohio Subclass comprised of and defined as:

> **All Ohio residents who purchased or leased any 2010-
> 2015 Cadillac SRX vehicle (the "Ohio Subclass").**

109.    Plaintiff Anderson brings this action on behalf of herself and the
members of a proposed Maryland Subclass comprised of and defined as follows:

> **All Maryland residents who purchased or leased any 2010-2015
> Cadillac SRX vehicle (the "Maryland Subclass").**

110.    Plaintiffs reserve the right to modify or amend the definition of the
proposed Classes before the Court determines whether certification is appropriate.

111.    Excluded from the Classes are GM, its parents, subsidiaries, affiliates,
officers and directors, any entity in which GM has a controlling interest, all
customers who make a timely election to be excluded, governmental entities, and all
judges assigned to hear any aspect of this litigation, as well as their immediate family
members.

112.    Numerosity: Although the exact number of Class Members is
uncertain and can only be ascertained through appropriate discovery, the number

is great enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in GM's possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

113.   Typicality:  Plaintiffs' claims are typical of the claims of the Class and Subclasses in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by GM, and equipped with the defective headlights.  The representative Plaintiffs, like all Class Members, have been damaged by GM's misconduct in that they have incurred or will incur the cost of repairing or replacing the defective headlight components.  Furthermore, the factual bases of GM's misconduct are common to all Class Members and represent a common thread resulting in injury to the Class as a whole.

114.   There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual Class members.

115.   Among the questions of law and fact common to the Classes are:

<ul>
<li>(a)      Whether Class Vehicles suffer from defects relating to the headlights;</li>
<li>(b)      Whether the defects relating to the headlights constitute an</li>
</ul>

unreasonable safety risk;

(c)     Whether GM knows about the defects relating to the headlights and, if so, how long GM has known of the defect;

(d)     Whether the defective nature of the headlights constitutes a material fact;

(e)     Whether GM has a duty to disclose the defective nature of the headlights to Plaintiffs and Class Members;

(f)     Whether Plaintiffs and the other Class Members are entitled to equitable relief, including but not limited to a preliminary and/or permanent injunction;

(g)     Whether GM knew or reasonably should have known of the defects relating to the headlights before it sold and leased Class Vehicles to Class Members;

(h)     Whether GM should be declared financially responsible for notifying all Class Members of the problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective headlight components;

(i)     Whether GM is obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace their defective headlight components;

(j)     Whether GM breached the implied warranty of merchantability pursuant to the Magnuson-Moss Act;

(k)     Whether GM breached its express warranties; and

(l)     Whether GM breached the implied warranty of merchantability.

116.   <u>Adequate Representation</u>: Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intends to prosecute this action vigorously.

117.   <u>Superiority</u>: Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of GM's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for GM's misconduct. Absent a class action, Class Members will continue to incur damages, and GM's misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal

litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

### FIRST CAUSE OF ACTION
### VIOLATION OF MARYLAND'S CONSUMER PROTECTION ACT
### Maryland Code, Com. Law § 13-101 *et seq.*
(On behalf of the Maryland Subclass)

118.   Plaintiff Anderson incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

119.   Maryland's Consumer Protection Act ("MCPA") is to be read broadly to protect consumers from unfair or deceptive trade practices.

120.   Plaintiff Anderson and  Maryland Subclass members are consumers under the MCPA.

121.   GM has engaged in engaged in unfair, abusive, or deceptive trade practices the conduct of a business, trade or commerce or in the furnishing of a service in Maryland.

122.   GM is a "merchant" within the meaning of Md. Com. Law Code § 13-101(g).

123.   Such unfair, unconscionable, or deceptive acts and practices include the following, all of which GM engaged in:

> a. misrepresenting that products or goods "have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have" Md. Com. Law Code § 13-301

(2)(i);

b. "[f]ailure to state a material fact if the failure deceives or tends to deceive," Md. Com. Law Code § 13-301 (3); and

c. "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with…[t]he promotion or sale of any consumer goods, consumer realty, or consumer service; Md. Com. Law Code § 13-301 (9)(i).

124.   GM violated and continues to violate the MCPA by engaging in the herein described unconscionable, deceptive, and unfair acts or practices proscribed by §§ § 13-101 *et seq*., *et seq*.  GM's omissions and practices described herein were likely to, did in fact, and will continue to deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment. By failing to disclose and concealing the defective nature of the headlights from Plaintiff Anderson and  Maryland Subclass members, GM violated MCPS, as it represented that the Class Vehicles and their headlights had characteristics and benefits that they do not have and represented that the Class Vehicles and their headlights were of a particular standard and quality, when they were in fact of another.

125.   GM's unfair and deceptive acts and practices occurred repeatedly in

GM's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

126.   GM knew that the Class Vehicles and their headlights suffered from an inherent defect and were not suitable for their intended use.

127.   As a result of their reliance on GM's omissions, Plaintiff Anderson and   Maryland Subclass members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Headlight Defect, Plaintiff Anderson and   Maryland Subclass members were harmed and suffered actual damages in that the Class Vehicles' headlight components are substantially certain to fail before their expected and useful life.

128.   GM was under a duty to Plaintiff Anderson and   Maryland Subclass members to disclose the defective nature of the headlights and/or the associated repair costs because:

(a)      GM was in a superior position to know the true state of facts about the safety defect in the Class Vehicles'  headlights;

(b)      Plaintiff Anderson and   Maryland Subclass members could not reasonably have been expected to learn or discover that their headlights had a dangerous safety defect until it manifested; and

(c)      GM knew that Plaintiff Anderson and  Maryland Subclass members could not reasonably have been expected to learn of or discover the safety defect.

129.   In failing to disclose the defective nature of the headlights, GM knowingly and intentionally concealed material facts, in breach of its duty to disclose.

130.   The facts GM concealed from or failed to disclose to Plaintiff Anderson and  Maryland Subclass members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay less. Had Plaintiff Anderson and Maryland Subclass members known that the Class Vehicles' headlights were defective, they would not have purchased or leased the Class Vehicles or would have paid less for them.

131.   Plaintiff Anderson and  Maryland Subclass members are reasonable consumers who do not expect the headlights installed in their vehicles to exhibit problems such as the extremely premature wear, and frequent replacement or repair, of the vehicle's headlights, in contravention of the reasonable and objective consumer expectation relating to vehicle headlights.

132.   As a direct and proximate result of GM's unfair or deceptive acts and practices alleged herein, Plaintiffs and Class Members suffered and will continue to suffer actual damages, which they are entitled to recover to the extent permitted by law, in an amount to be proven at trial.

133.   Plaintiff Anderson and Members of the Class are entitled to recover

actual damages, all costs, attorneys' fees, statutory fees and penalties, exemplary damages, consequential damages, and to receive any available equitable remedy.

## SECOND CAUSE OF ACTION
## FRAUDULENT CONCEALMENT
(On behalf of the Maryland Subclass)

134.   Plaintiff Anderson incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

135.   GM intentionally concealed the Headlight Defect, or acted with reckless disregard for the truth, and denied Plaintiff Anderson and  Maryland Subclass members information that is highly relevant to their purchasing decision.

136.   GM further affirmatively concealed from Plaintiff Anderson and Maryland Subclass members in advertising and other outlets of communication, that the Class Vehicles it was selling had no significant defects, and would perform and operate properly when driven in normal usage.

137.   GM knew at the time it actively concealed this information that this information was material.

138.   The Class Vehicles purchased or leased by Plaintiff Anderson and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained Headlight Defect, as alleged herein.

139.   GM owed Plaintiff Anderson and Maryland Subclass members a duty to disclose true safety, performance, and reliability of Class Vehicles because

Plaintiff Anderson and Maryland Subclass members relied on GM's material representations that the Class Vehicles they were purchasing were safe and free from defects.

140.   The aforementioned concealment of the Headlight Defect was material because if it had been disclosed Plaintiff Anderson and Maryland Subclass members would not have bought or leased the Class Vehicles or would not have bought or leased those Vehicles at the prices they paid.

141.   Plaintiff Anderson and Maryland Subclass members relied on GM's reputation, advertising, and its failure to disclose the faulty and defective nature of the headlights – in purchasing or leasing Class Vehicles.

142.   As a result of their reliance, Plaintiff Anderson and Maryland Subclass members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

143.   GM's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff Anderson and Maryland Subclass members. Plaintiff Anderson and Maryland Subclass members are therefore entitled to an award of punitive damages.

144.   Plaintiff Anderson and Maryland Subclass members are entitled to recover actual damages, all costs, attorneys' fees, statutory fees and penalties,

exemplary damages, consequential damages, and to receive any available equitable remedy.

### THIRD CAUSE OF ACTION
### UNJUST ENRICHMENT
(On behalf of the Maryland Subclass)

145.  Plaintiff Anderson incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

146.  GM has received and retained a benefit from Plaintiff Anderson and Maryland Subclass members and inequity has resulted.

147.  GM has benefitted from selling and leasing defective cars whose value was artificially inflated by GM's concealment of the Headlight Defect at a profit, Plaintiff Anderson and  Maryland Subclass members have overpaid for the cars and been forced to pay other costs.

148.  Thus, Plaintiff Anderson and all Maryland Subclass members conferred a benefit on GM.

149.  It is inequitable for GM to retain these benefits.

150.  Plaintiff Anderson and Maryland Subclass members were not aware of the true facts about the Class Vehicles, and did not benefit from GM's conduct.

151.  GM knowingly accepted the benefits of its unjust conduct.

152.  As a result of GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

153.   In addition to disgorgement, Plaintiffs are entitled to any other available damage and/or equitable remedy.

## FOURTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (MD. CODE COM. LAW § 2-314)
(On behalf of the Maryland Subclass)

154.   Plaintiff Anderson incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

155.   GM was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

156.   By operation of law, GM provided Plaintiff Anderson and  Maryland Subclass members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

157.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their headlights manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their headlights would be fit for their intended use while the Class Vehicles were being operated.

158.   Contrary to the applicable implied warranties, the Class Vehicles and their headlights at the time of sale and thereafter were not fit for their

ordinary and intended purpose of providing Plaintiff Anderson and  Maryland Subclass members with reliable, durable, and safe transportation. Instead, the Class Vehicles are dangerous due to the Headlight Defect.

159.   The Headlight Defect is inherent in each Class Vehicle and was present in each Class Vehicle at the time of sale.

160.   GM provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like GM routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

161.   GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

162.   As a result of GM's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.

163.   Additionally, as a result of the Headlight Defect, Plaintiff Anderson and Maryland Subclass members were harmed and suffered actual damages, in an amount to be proven at trial, in that the Class Vehicles' headlight components are substantially certain to fail before their expected useful life has run. Plaintiff Anderson and  Maryland Subclass members are entitled to recover actual damages, all costs, attorneys' fees, statutory fees and penalties, exemplary damages,

consequential damages, and to receive any available equitable remedy.

## FIFTH CAUSE OF ACTION
## VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349
(On behalf of the New York Subclass Only)

164.   Plaintiff LaTorre incorporates by reference the foregoing allegations of this Complaint as if fully set forth herein.

165.   As described in detail above, GM's failure to disclose and active concealment of the defective nature of the headlights from Plaintiffs and Class Members and its representation that the Class Vehicles and their headlights were of a particular standard and quality when they were not, has been, and continues to be, materially misleading and deceptive to Plaintiffs and members of the Class in material respects, in violation of the consumer protection provisions of § 349 of the New York General Business Law.

166.   Plaintiff LaTorre and New York Subclass members have been, and continue to be, injured by reason of their being deceived and misled by GM.

167.   GM's misleading and deceptive misconduct is ongoing and will continue unless enjoined by the Court.

168.   Based upon the foregoing, Plaintiff LaTorre and New York Subclass members are entitled to a restraining order, preliminary injunction and permanent injunction, enjoining GM from continuing its unfair, deceptive, and unlawful conduct.

169.   Based upon the foregoing, Plaintiff LaTorre and New York Subclass members are entitled to recover their actual damages.

170.   Based upon the foregoing, Plaintiff LaTorre and New York Subclass members are entitled to payment of their attorneys' fees.

171.   Plaintiff LaTorre and New York Subclass members have no remedy at law.

172.   As a result of GM's violations of General Business Law § 349, Plaintiff LaTorre and New York Subclass members are entitled, under General Business Law § 349(h), to recover damages in an amount to be determined at trial. Plaintiff LaTorre and members of the class are entitled to recover actual damages, all costs, attorneys' fees, statutory fees and penalties, exemplary damages, consequential damages and to receive any available equitable remedy.

**SIXTH CAUSE OF ACTION**
**VIOLATION OF NEW YORK FALSE ADVERTISING LAW § 350**
(On behalf of the New York Subclass Only)

173.   Plaintiff LaTorre incorporates by reference the foregoing allegations of this Complaint as if fully set forth herein.

174.   As described in detail above, GM has repeatedly and persistently engaged in materially deceptive, misleading or false advertising: disseminating deceptive, misleading or false advertising regarding the Class Vehicles and that their headlights were of a particular standard and quality when they were not, that was

directed at and which affected consumers, including purchasers of the class vehicles, a group that includes Plaintiff La Torre, in violation of the consumer protection provisions of § 350 and 350a of the New York General Business Law.

175.   GM's deceptive, misleading, or false advertising are likely to mislead, and have mislead, reasonable consumers and purchasers of the Class Vehicles.

176.   Plaintiff LaTorre and members of the New York Subclass reasonable and justifiable relied on GM's deceptive, misleading or false advertising in purchasing the class vehicles.

177.   GM's violation of Section 350 has caused Plaintiff LaTorre and New York Subclass members to suffer injury including, inter alia, buying the Class Vehicles with the Headlight Defect.  Plaintiff LaTorre and New York Subclass members have been, and continue to be, injured by reason of their being deceived and misled by GM.

178.   GM's deceptive practices were consumer-oriented.  Since its ads and marketing materials were distributed to the public, its  dealerships are open to the public, and the Class Vehicles are available to the public through its website, large numbers of consumers purchased the class videos.

179.   Additionally, GM's deceptive conduct undermined New York's interest in an honest marketplace in which economic activity is conducted in a fair and competitive manner.

180.    GM's conduct was knowing and intentional.

181.    GM's misleading and deceptive misconduct is ongoing and will continue unless enjoined by the Court.

182.    Based upon the foregoing, Plaintiff LaTorre and New York Subclass members are entitled to a restraining order, preliminary injunction and permanent injunction, enjoining GM from continuing its unfair, deceptive, and unlawful conduct.

183.    Based upon the foregoing, Plaintiff LaTorre and New York Subclass members are entitled to recover their actual damages.

184.    Based upon the foregoing, Plaintiff LaTorre and New York Subclass members are entitled to payment of their attorneys' fees.

185.    Plaintiff LaTorre and New York Subclass members have no remedy at law.

186.    As a result of GM's violations of General Business Law § 349, Plaintiff LaTorre and New York Subclass members are entitled, under General Business Law § 350(e), to recover all applicable damages, including treble damages, punitive damages, all costs, attorneys' fees, statutory fees and penalties, exemplary damages, consequential damages, and to receive any available equitable remedy.

## SEVENTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT
### (On behalf of the New York Subclass Only)

187.   Plaintiff LaTorre incorporates by reference the foregoing allegations of this Complaint as if fully set forth herein.

188.   GM intentionally concealed the Headlight Defect, or acted with reckless disregard for the truth, and denied Plaintiff LaTorre and New York Subclass members information that is highly relevant to their purchasing decision.

189.   GM further affirmatively concealed from Plaintiff LaTorre and New York Subclass members in advertising and other outlets of communication, that the Class Vehicles it was selling had no significant defects, and would perform and operate properly when driven in normal usage.

190.   GM knew at the time it actively concealed this information that the Headlight Defect existed that this information was material.

191.   The Class Vehicles purchased or leased by Plaintiff LaTorre and New York Subclass members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained Headlight Defect, as alleged herein.

192.   GM owed Plaintiff LaTorre a duty to disclose true safety, performance, and reliability of Class Vehicles because Plaintiff LaTorre and New York Subclass members relied on GM's material representations that the Class Vehicles they were purchasing were safe and free from defects.

193.   The aforementioned concealment of the Headlight Defect was material because if it had been disclosed Plaintiff LaTorre and New York Subclass members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

194.   Plaintiff LaTorre and New York Subclass members relied on GM's reputation, advertising, and its failure to disclose the faulty and defective nature of the headlights – in purchasing or leasing Class Vehicles.

195.   As a result of their reliance, Plaintiff LaTorre and New York Subclass members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

196.   GM's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff LaTorre and New York Subclass members. Plaintiff LaTorre and New York Subclass members are therefore entitled to an award of punitive damages.

197.   Plaintiff LaTorre and the New York Subclass are entitled to recover actual damages, punitive damages, all costs, attorneys' fees, statutory fees and penalties, exemplary damages, consequential damages, and to receive any available equitable remedy.

## EIGHTH CAUSE OF ACTION
## UNJUST ENRICHMENT (NEW YORK COMMON LAW)
(On behalf of the New York Subclass Only)

198.   Plaintiff LaTorre incorporates by reference the foregoing allegations of this Complaint as if fully set forth herein.

199.   GM has received and retained a benefit from Plaintiff LaTorre and New York Subclass members and inequity has resulted.

200.   GM has benefitted from selling and leasing defective cars whose value was artificially inflated by GM's concealment of the Headlight Defect at a profit, and Plaintiff LaTorre and New York Subclass members have overpaid for the cars and been forced to pay other costs.

201.   Thus, Plaintiff LaTorre and all New York Subclass members conferred a benefit on GM.

202.   It is inequitable for GM to retain these benefits.

203.   Plaintiff LaTorre and the New York Subclass were not aware of the true facts about the Class Vehicles, and did not benefit from GM's conduct.

204.   GM knowingly accepted the benefits of its unjust conduct.

205.   As a result of GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

206.   Plaintiff LaTorre and the New York Subclass are entitled to recover actual damages, punitive damages, all costs, attorneys' fees, statutory fees and

penalties, exemplary damages, consequential damages, and to receive any available equitable remedy.

## NINTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (NY U.C.C. Law § 2-314))
(On behalf of the New York Subclass Only)

207.   Plaintiff LaTorre incorporates by reference the foregoing allegations of this Complaint as if fully set forth herein.

208.   GM was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

209.   By operation of law, GM provided Plaintiff LaTorre and New York Subclass members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

210.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their headlights manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their headlights would be fit for their intended use while the Class Vehicles were being operated.

211.   Contrary to the applicable implied warranties, the Class Vehicles and their headlights at the time of sale and thereafter were not fit for their ordinary and

intended purpose of providing Plaintiff Williams and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are dangerous due to the Headlight Defect.

212.   The Headlight Defect is inherent in each Class Vehicle and was present in each Class Vehicle at the time of sale.

213.   GM provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like GM routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

214.   GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

215.   As a result of GM's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.

216.   Additionally, as a result of the Headlight Defect, Plaintiff LaTorre and New York Subclass members were harmed and suffered actual damages, in an amount to be proven at trial, in that the Class Vehicles' headlight components are substantially certain to fail before their expected useful life has run.

217.   Plaintiff LaTorre and New York Subclass members are entitled to recover actual damages, all costs, attorneys' fees, statutory fees and penalties,

exemplary damages, consequential damages, and to receive any available equitable remedy.

## TENTH CAUSE OF ACTION
## VIOLATION OF OHIO'S DECEPTIVE TRADE PRACTICES ACT
## OHIO REVISED CODE §4165, *ET SEQ.*
(On behalf of the Ohio Subclass Only)

218.   Plaintiff Williams incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

219.   GM is a person as defined in Ohio Revised Code § 4165.01(D).

220.   As described in detail above, by failing to disclose and actively concealing the defective nature of the headlights from Plaintiff Williams and Ohio Subclass members, GM violated § 4165.02, as it represented that the Class Vehicles and their headlights had characteristics and benefits that they do not have and that the Class Vehicles and their headlights were of a particular standard, quality, or grade when they were of another.

221.   GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

222.   As a direct and proximate result of GM's unfair or deceptive acts and practices alleged herein, Plaintiff Williams and Ohio Subclass members suffered and will continue to suffer actual damages, which they are entitled to recover to the extent permitted by law, in an amount to be proven at trial.

223.   Plaintiff Williams and Ohio Subclass members are entitled to recover actual damages, all costs, attorneys' fees, statutory fees and penalties, exemplary damages, consequential damages, and to receive any available equitable remedy.

## ELEVENTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT
(On behalf of the Ohio Subclass Only)

224.   Plaintiff Williams incorporates by reference the foregoing allegations of this Complaint as if fully set forth herein.

225.   GM intentionally concealed the Headlight Defect, or acted with reckless disregard for the truth, and denied Plaintiff Williams and Ohio Subclass members information that is highly relevant to their purchasing decision.

226.   GM further affirmatively concealed from Plaintiff Williams and Ohio Subclass members in advertising and other outlets of communication, that the Class Vehicles it was selling had no significant defects, and would perform and operate properly when driven in normal usage.

227.   GM knew at the time it actively concealed this information that this information was material.

228.   The Class Vehicles purchased or leased by Plaintiff Williams and Ohio Subclass members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained Headlight Defect, as alleged herein.

229.   GM owed Plaintiff Williams and Ohio Subclass members a duty to

disclose true safety, performance, and reliability of Class Vehicles because Plaintiff Williams and Ohio Subclass members relied on GM's material representations that the Class Vehicles they were purchasing were safe and free from defects.

230.   The aforementioned concealment of the Headlight Defect was material because if it had been disclosed Plaintiff Williams and Ohio Subclass members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

231.   Plaintiff Williams and Ohio Subclass members relied on GM's reputation, advertising, and its failure to disclose the faulty and defective nature of the headlights – in purchasing or leasing Class Vehicles.

232.   As a result of their reliance, Plaintiff Williams and Ohio Subclass members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

233.   GM's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff Williams and Ohio Subclass members. Plaintiff Williams and Ohio Subclass members are therefore entitled to an award of punitive damages.

234.   Plaintiff Williams and Ohio Subclass members are entitled to recover actual damages, punitive damages, all costs, attorneys' fees, statutory fees and

penalties, exemplary damages, consequential damages, and to receive any available equitable remedy.

## THIRTEENTH CAUSE OF ACTION
### UNJUST ENRICHMENT
(On behalf of the Ohio Subclass Only)

235.    Plaintiff Williams incorporates by reference the foregoing allegations of this Complaint as if fully set forth herein.

236.    GM has received and retained a benefit from Plaintiff Williams and Ohio Subclass members and inequity has resulted.

237.    GM has benefitted from selling and leasing defective cars whose value was artificially inflated by GM's concealment of the Headlight Defect at a profit, and Plaintiff Williams and Ohio Subclass members  have overpaid for the cars and been forced to pay other costs.

238.    Thus, Plaintiff Williams and Ohio Subclass members conferred a benefit on GM.

239.    It is inequitable for GM to retain these benefits.

240.    Plaintiff Williams and Ohio Subclass members were not aware of the true facts about the Class Vehicles, and did not benefit from GM's conduct.

241.    GM knowingly accepted the benefits of its unjust conduct.

242.    As a result of GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

243. Plaintiff Williams and Ohio Subclass members are entitled to recover actual damages, punitive damages, all costs, attorneys' fees, exemplary damages, consequential damages, and to receive any available equitable remedy

## FOURTEENTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (OHIO REV. CODE § 1302.27)(U.C.C. § 2-314))
(On behalf of the Ohio Subclass Only)

244. Plaintiff Williams incorporates by reference the foregoing allegations of this Complaint as if fully set forth herein.

245. GM was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

246. By operation of law, GM provided Plaintiff Williams and Ohio Subclass members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

247. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their headlights manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their headlights would be fit for their intended use while the Class Vehicles were being operated.

248. Contrary to the applicable implied warranties, the Class Vehicles and

their headlights at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff Williams and Ohio Subclass members with reliable, durable, and safe transportation. Instead, the Class Vehicles are dangerous due to the Headlight Defect.

249.   The Headlight Defect is inherent in each Class Vehicle and was present in each Class Vehicle at the time of sale.

250.   GM provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like GM routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

251.   GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

252.   As a result of GM's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Headlight Defect, Plaintiff Williams and Ohio Subclass members were harmed and suffered actual damages, in an amount to be proven at trial, in that the Class Vehicles' headlight components are substantially certain to fail before their expected useful life has run.

253.   Plaintiff Williams and Ohio Subclass members are entitled to recover

actual damages, all costs, attorneys' fees, statutory fees and penalties, exemplary damages, consequential damages, and to receive any available equitable remedy.

### FIFTEENTH CAUSE OF ACTION
### BREACH OF IMPLIED WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2303 *et seq.*
(on Behalf of the Classes)

254.   Plaintiffs incorporate by reference the foregoing allegations of this Complaint as if fully set forth herein.

255.   Plaintiffs bring this cause of action on behalf of themselves and on behalf of the Classes.

256.   The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

257.   Plaintiffs and Members of the Classes are "consumers" within the meaning of the Magnuson- Moss Warranty Act, 15 U.S.C. § 2301(3).

258.   GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

259.   GM impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their headlights manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their headlights would be fit for their intended use while being operated.

260.   Contrary to the applicable implied warranties, due to the Headlight Defect, the Class Vehicles were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation.

261.   GM's breach of its implied warranties has deprived Plaintiffs and Class Members of the benefit of their bargain.

262.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25,000. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

263.   GM has been afforded a reasonable opportunity to cure its breach, including when Plaintiffs and Class Members brought their vehicles in for diagnoses and repair of the headlights.

264.   As a direct and proximate cause of GM's breach of implied warranties, Plaintiffs and Class Members sustained damages and other losses in an amount to be determined at trial. GM's conduct damaged Plaintiffs and Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

265.   As a result of GM's violations of the Magnuson-Moss Warranty Act as

alleged herein, Plaintiffs and Members of the Classes have incurred damages.

## RELIEF REQUESTED

Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against GM, as follows:

(a)     An order certifying the proposed Classes and Subclasses, designating Plaintiffs as named representative of the Classes and Subclasses, and designating the undersigned as Class Counsel;

(b)     A declaration that GM is financially responsible for notifying all Class Members about the defective nature of the headlights, including the need for periodic maintenance;

(c)     An order enjoining GM from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling GM to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling GM to remove, repair, and/or replace the Class Vehicles' defective headlight components with suitable alternative product(s) that do not contain the defects alleged herein; enjoining GM from selling the Class Vehicles without disclosing the Defective Headlight; and/or compelling GM to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

(d)     An award to Plaintiffs and the Class for compensatory, exemplary,

and statutory damages, including interest, in an amount to be proven at trial;

(e)   Any and all remedies provided pursuant to the Magnuson- Moss Warranty Act;

(f)   A declaration that GM must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of its Class Vehicles, or make full restitution to Plaintiffs and Class Members;

(g)   An award of attorneys' fees and costs, as allowed by law;

(h)   An award of pre-judgment and post-judgment interest, as provided by law;

(i)   Leave to amend the Complaint to conform to the evidence produced at trial; and

(j)   Such other relief, including damages at law and equitable relief, as may be appropriate under the circumstances.

## **<u>DEMAND FOR JURY TRIAL</u>**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable.

Date: April 16, 2019                     Respectfully submitted,

*/s/ E. Powell Miller*
E.  Powell Miller (P39487*)*
Sharon Almonrode (P33938)
William Kalas (P82113)

**THE MILLER LAW FIRM, P.C.**
950 West University Drive
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com
wk@millerlawpc.com

**TYCKO & ZAVAREEI LLP**
Hassan Zavareei (*admission forthcoming*)
1828 L Street, N.W., Suite 1000
Washington, D.C.  20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
hzavareei@tzlegal.com

**TYCKO & ZAVAREEI LLP**
Annick M. Persinger (*admission forthcoming*)
1970 Broadway, Suite 1070
Oakland, CA 94612
Telephone: (510) 254-6808
Facsimile: (202) 973-0950
apersinger@tzlegal.com

**KOPELOWITZ OSTROW FERGUSON WEISELBERG GILBERT**
Jeff Ostrow (*admission forthcoming*)
Daniel Tropin (*admission forthcoming*)
One W. Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300
ostrow@kolawyers.com
tropin@kolawyers.com

**KALIEL PLLC**
Jeffrey D. Kaliel (*admission forthcoming*)
Sophia G. Gold (*admission forthcoming*)

1875 Connecticut Ave., NW, 10th Floor
Washington, D.C.  20009
Telephone: (202) 350-4783
jkaliel@kalielpllc.com
sgold@kalielpllc.com

***Counsel for Plaintiffs and the Class***